**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and CHARLES A. WHOBREY, as Trustee, | ) ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | |
| TRANSERVICE LOGISTICS, INC., a New York corporation, | ) ) ) | Case Nos.  20-cv-4610  20-cv-4611 |
| *Defendant.* | ) ) | |
| | ) | Judge Ronald A. Guzman |
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and CHARLES A. WHOBREY, as Trustee, | ) ) ) ) | Magistrate Judge Sheila M. Finnegan |
| *Plaintiffs,* | ) ) | *Reassigned as related cases per 09/09/2020 Executive Order* |
| v. | ) ) | |
| ZENITH LOGISTICS, INC., an Ohio corporation, | ) ) ) | |
| *Defendant.* | ) ) | |

**PLAINTIFFS' CONSOLIDATED MEMORANDUM IN RESPONSE TO
DEFENDANTS' MOTIONS TO DISMISS AND IN SUPPORT OF
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY</u>**

## TABLE OF CONTENTS

INTRODUCTION     1

SUMMARY OF MATERIAL FACTS     2

ARGUMENT     4

I.    Summary Judgment should be granted to the Fund because the 2013 CBAs' evergreen clauses extended the pension obligations for an additional year.     4

     A. The termination defense is limited in suits involving delinquent benefit fund contributions and requires clear and unequivocal evidence of termination.     4

     B. The 2013 CBAs were never terminated by either Defendants or Local 89, resulting in an extension of the pension obligations through January 31, 2020.     6

II.    The bargaining parties could modify the labor contracts via-a-vis themselves, but they could not eliminate the pension obligations prior to January 31, 2020, because of their prior promises to contribute to the Fund for the "entire term" of the applicable CBA.     9

III.    Defendants rely on a set of "rules of labor contract interpretation" that do not exist under applicable Seventh Circuit law and that contradict applicable law.     11

CONCLUSION     15

# TABLE OF AUTHORITIES

**Case Law & NLRB Decisions**

*Baker v. Fleet Maint., Inc.*,
409 F.2d 551 (7th Cir. 1969) ............................................................. 15

*Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*,
118 F.3d 1018 (4th Cir. 1997) ............................................................ 11

*Baldanza Bakery, Inc. (In re)*,
149 B.R. 370 (Bankr. D.N.J. 1992) .......................................................8

*Bd. of Trs. of the Teamsters Misc. Sec. Tr. Fund v. Alsco, Inc.*,
No. 18-cv-1078, 2019 WL 3852489 (C.D. Cal. May 15, 2019) ............................6, 9, 15

*Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*,
870 F.2d 1148 (7th Cir. 1989) ...................................................passim

*Cent. States, Se. & Sw. Areas Pension Fund v. Kabbes Trucking Co.*,
No. 02-cv-1809, 2004 WL 2644515 (N.D. Ill. Nov. 18, 2004) ................................ 5, 15

*Cent. States, Se. & Sw. Areas Pension Fund v. Sara Lee Bakery Grp., Inc.*,
No. 07-cv-5880, 2010 WL 6614902 (N.D. Ill. July 12, 2010),
*R. & R. adopted in its entirety*, 2011 WL 862040 (N.D. Ill. March 10, 2011)................5

*Cent. States, Se. & Sw. Areas Pension Fund v. Standard Elec. Co.*,
87 F. Supp. 3d 810 (N.D. Ill. 2015) ......................................................8, 10, 11

*Cent. States, Se. & Sw. Areas Pension Fund v. Transport, Inc.*,
183 F.3d 623 (7th Cir. 1999) ...........................................................9

*Champaign Cty. Contractors Ass'n*,
210 NLRB 467 (1974) ................................................................. 14

*Checker Motors Corp.*,
339 NLRB 291 (2003) ................................................................. 14

*Chi. Tribune Co. v. NLRB*,
974 F.2d 933 (7th Cir. 1992) ........................................................... 12

*Contempo Design, Inc. v. Chi. & Ne. Ill. Dist. Council of Carpenters*,
226 F.3d 535 (7th Cir. 2000) ...........................................................9

*Irwin v. Carpenters Health & Welfare Tr. Fund of Cal.*,
745 F.2d 553 (9th Cir. 1984) ...........................................................9

*La. Bricklayers & Trowel Trades Pension Fund v. Alfred Miller Gen. Masonry Contracting Co.*,
157 F.3d 404 (5th Cir. 1998) ..................................................................................................5

*Laborers Health & Welfare Tr. Fund for N. Cal. v. Advanced Lightweight Concrete Co.*,
484 U.S. 539 (1988) ...............................................................................................................4

*Litton Fin. Printing Div. v. NLRB*,
501 U.S. 190 (1991) .............................................................................................................12

*Martin v. Garman Constr. Co.*,
945 F.2d 1000 (7th Cir. 1991) .............................................................................................12

*N.J. Esso Empls.' Ass'n*,
275 NLRB 216 (1985) ..........................................................................................................15

*Oakland Press Co.*,
229 NLRB 476 (1977) ..........................................................................................................12

*Office & Prof'l Empls. Int'l Union, Local 95 v. Wood Cty. Tele. Co.*,
408 F.3d 314 (7th Cir. 2005) .........................................................................................passim

*Oil, Chemical & Atomic Workers Int'l Union v. Am. Maize Prods. Co.*,
492 F.2d 409 (7th Cir. 1974) ...............................................................................................14

*Op. Engr's Local 139 Health Benefit Fund v. Gustafson Constr. Corp.*,
258 F.3d 645 (7th Cir. 2001) ...........................................................................................7, 15

*Orrand v. Scassa Asphalt, Inc.*,
794 F.3d 556 (6th Cir. 2015) ...........................................................................5, 6, 11, 15

*S. Texas Chapter, Associated Gen. Contractors*,
190 NLRB 383 (1971) ..........................................................................................................12

*Twin City Pipe Trades Serv. Ass'n v. Frank O'Laughlin Plumb. & Heating Co.*,
759 F.3d 881 (8th Cir. 2014) .............................................................................................5, 6

**Statutes**

29 U.S.C. § 1145 ....................................................................................................................4

## INTRODUCTION

Plaintiffs in the related cases, Central States, Southeast and Southwest Areas Pension Fund (the "Fund") and its trustee, seek to collect unpaid pension contributions from Defendants Transervice Logistics, Inc. ("Transervice") and Zenith Logistics, Inc. ("Zenith") for the period of February 2019 through January 2020. Defendants have moved to dismiss the complaints, arguing that their duty to contribute to the Fund under applicable collective bargaining agreements (the "2013 CBAs") terminated as of January 31, 2019. But under the 2013 CBAs' plain terms, termination could only occur if one of the parties gave "written notice sixty (60) days prior to [January 31, 2019] of such part[y's] intention to terminate" the CBA; otherwise, the CBAs "shall continue for another year" under what is known as an "evergreen" clause. Neither the union nor Defendants served the required notice to terminate. Instead, the union just sent a letter expressing a "desire to meet" for negotiations. Because the 2013 CBAs were not terminated 60 days before January 31, 2019, the 2013 CBAs continued for another year, and the contributions are owed.

Furthermore, Defendants' duties to contribute for an additional year could not be cut off by new CBAs that purported to eliminate those duties effective January 31, 2019, because of Defendants' and the union's preexisting promises to follow the Fund's Trust Agreement. The Trust Agreement states that Defendants must contribute for the *entire term* of their respective 2013 CBA, "including any extension through an evergreen clause," which is a uniform rule for all employers in the Fund used to prevent against manipulation of termination dates.

Finally, no material facts are in dispute, as both Defendants concede that their termination defenses are "based exclusively on the Complaint[s] and their exhibits." (*See* Transervice's Memo. of Law, Case No. 20-cv-4610, Dkt. #19 ("TS Memo."), p. 8, n.4. For brevity, the Fund cites only to Transervice's brief herein because Zenith's brief is "substantively identical." (Case No. 20-cv-

4610, Dkt. #20 (minute entry)).) Thus, not only should Defendants' motions be denied, but a summary disposition against them as to liability is also appropriate. As shown below, Defendants' termination defense fails as a matter of law under the heightened standards required to prove termination in ERISA § 515 suits for unpaid contributions. Defendants' attempt to create their own set of "labor contract rules," based on NLRB decisions that do not apply, does not change that result. Accordingly, the Court should enter summary judgment as to liability in the Fund's favor.

## SUMMARY OF MATERIAL FACTS

In 2013, Defendants each signed CBAs—the 2013 CBAs—with Teamster Local Union No. 89 ("Local 89"). (*See* Fund's Local Rule 56.1 Statements of Material Facts as to Transervice ("SMF-T"), ¶ 8, and as to Zenith ("SMF-Z"), ¶ 8.) Under the 2013 CBAs, Defendants agreed to make pension contributions to the Fund. (SMF-T, ¶¶ 9-10; SMF-Z, ¶¶ 9-10.) Defendants, along with Local 89, also agreed to be bound by the Fund's Trust Agreement. (SMF-T, ¶¶ 11, 19; SMF-Z, ¶¶ 11, 14.) The duration provisions of the 2013 CBAs stated:

> This Agreement shall be effective as of February 1, 2013 and shall expire January 31, 2019; provided, however, that if neither party gives the other party written notice sixty (60) days prior to the said expiration date of such parties intention to terminate this Agreement, said Agreement shall continue for another year and from year to year thereafter, subject to sixty (60) days' notice of termination prior to any succeeding termination date.

(SMF-T, ¶ 12; SMF-Z, ¶ 12.)

Article III, Section 7(a) of the Fund's Trust Agreement states that any union-employer agreement that purports to eliminate the duty to contribute before the termination of a CBA, including extensions through an evergreen clause, is unenforceable against the Fund:

> An Employer is obliged to contribute to the Fund for the entire term of any [CBA] . . . (*including any extension of a [CBA] through an evergreen clause* . . .) on the terms stated in that [CBA] . . . The following provisions contained in any agreement shall not be enforceable against the Fund (regardless of when the agreement was entered into): a) a provision contained in either a [CBA] . . . or any agreement

> entered into by an Employer and Union subsequent to the [CBA] that purports to authorize the elimination or reduction of the duty to contribute to the Fund before the termination of the [CBA] . . . under its duration provision (*including any extension through an evergreen clause*) . . . .

(SMF-T, ¶ 21; SMF-Z, ¶ 16 (emphasis added).) Article XIV, Section 11 of the Trust Agreement also provides that "[t]o the extent there is a conflict between this Agreement and any provisions of a [CBA] . . . and/or any other union-employer agreement, this Agreement shall control." (SMF-T, ¶ 22; SMF-Z, ¶ 17.) Transervice and Local 89 are also parties to a Participation Agreement under which they agreed that an agreement "shall not be valid" if it "purports to prospectively eliminate the duty to contribute to the . . . Fund during the stated term of a [CBA] . . . ." (SMF-T, ¶¶ 13, 16.)

In separate letters dated November 6, 2018 (the "November 6 Letters"), Local 89 advised Defendants that it desired to schedule collective-bargaining negotiations:

> Your present contract with General Drivers, Warehousemen, and Helpers, Local Union No. 89, expires as noted above [a header referred to a contract expiration date of 1/31/2019 and 2/01/2019, respectively]. It is our desire to meet with you at an early date for the purpose of negotiating a new contract. We trust the forthcoming negotiations will result in an agreement that will be fair and just too [sic] all parties involved and that a better spirit of harmony and cooperation will be derived there from.

(SMF-T, ¶ 24; SMF-Z, ¶ 19.) Neither Transervice nor Zenith served any timely written notice expressing an intention to terminate their respective 2013 CBA. (SMF-T, ¶ 25; SMF-Z, ¶ 20.)

Around January 31, 2019, the Fund received letters from Defendants attaching new CBAs each company had signed with Local 89 (the "2019 CBAs") that purported to eliminate Defendants' obligations to the Fund on behalf of Local 89 members "effective on January 31, 2019." (SMF-T, ¶¶ 26-28; SMF-Z, ¶¶ 21-23.) The Fund concluded, however, after reviewing Local 89's letters, that the 2013 CBAs had not been properly terminated and that contributions were owed through January 31, 2020. (SMF-T, ¶ 30; SMF-Z, ¶ 25.) Defendants have not paid contributions to the Fund for the 12 months at issue. (SMF-T, ¶ 31; SMF-Z, ¶ 26.)

## ARGUMENT

I. **Summary judgment should be granted to the Fund because the 2013 CBAs' evergreen clauses extended the pension obligations for an additional year.**

Under ERISA § 515, 29 U.S.C. § 1145, employers must make contributions that are promised under the terms of their applicable CBA or the plan:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

*Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv.*, 870 F.2d 1148, 1149 (7th Cir. 1989) (en banc) ("This means . . . a plan may enforce the writings according to their terms . . . .")

The 2013 CBAs required Defendants to contribute to the Fund through January 31, 2019, and "for another year . . . thereafter" unless one of the CBA parties provided timely written notice of "such part[y's] intention to terminate [the] Agreement." Because Defendants did not serve their own notice, they are left to rely solely on the three sentences in Local 89's November 6 Letters and the forms Local 89 sent to the FMCS. Under applicable § 515 case law, Defendants can only prevail if Local 89's intent in those documents was so unequivocal that the evidence of termination is incontestable. Defendants cannot satisfy that standard.

### A. The termination defense is limited in suits involving delinquent benefit fund contributions and requires clear and unequivocal evidence of termination.

Employer defenses are limited in cases under ERISA § 515, and for good reason. When Congress enacted § 515, it was concerned about "lengthy, costly and complex litigation concerning claims and defenses unrelated to the employer's promise and the plans' entitlement to the contributions." *Laborers Health & Welfare Tr. Fund for N. Cal. v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 547 & n.14 (1988) (quoting legislative reports). To reduce costs and help avoid the risk of unfunded obligations, Congress placed plans in a status similar to that of a "holder in

due course in commercial law . . . or like the receiver of a failed bank." *Gerber Truck*, 870 F.2d at 1149, 1151-54. As a result, certain employer defenses based upon labor law, such as ones based on the union's lack of majority support and the consequent ineffectiveness of a CBA under labor law, are unavailable altogether. *Id.* at 1153.

Consistent with this framework, a court's inquiry is narrow when an employer contends that its contribution obligation was terminated. First, any alleged termination notice must "unequivocally communicat[e the] intent to withdraw from the CBA" to be effective. *Orrand v. Scassa Asphalt, Inc*., 794 F.3d 556, 564 (6th Cir. 2015); *see also Twin City Pipe Trades Serv. Ass'n v. Frank O'Laughlin Plumb. & Heating Co.*, 759 F.3d 881, 885 (8th Cir. 2014) (termination notice must show "unequivocal intent"). And second, the evidence on which the employer relies must withstand a "superficial" inquiry. *Orrand*, 794 F.3d at 564. This may include a brief look at the "face of the documents," but "if the issue of termination cannot be resolved through cursory review, the defense . . . will not succeed." *La. Bricklayers & Trowel Trades Pension Fund v. Alfred Miller Gen. Masonry Contracting Co*., 157 F.3d 404, 409 & n.12 (5th Cir. 1998). Within this circuit, courts describe this standard to mean the "termination defense is only available if the termination is *incontestable*, and [if] not . . . ERISA bars consideration of the . . . defense." *Cent. States, Se. & Sw. Areas Pension Fund v. Sara Lee Bakery Grp., Inc.* No. 07-cv-5880, 2010 WL 6614902, at *5 (N.D. Ill. July 12, 2010) (emphasis added), *R. & R. adopted in its entirety*, 2011 WL 862040, at *1 & n.5 (N.D. Ill. March 10, 2011); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Kabbes Trucking Co.*, No. 02-cv-1809, 2004 WL 2644515, *18 (N.D. Ill. Nov. 18, 2004).

For example, in *Orrand,* the Sixth Circuit engaged in a "limited examination" by looking at a letter expressing the union's desire "to open negotiations for a new agreement." 794 F.3d at 564. Since the "letter . . . indicated a desire on the part of the Union to continue the relationship

between the parties, not to terminate it," the court affirmed a judgment in the plan's favor for unpaid contributions because the CBAs continued under the evergreen clauses. *Id.* at 564-65, 567. Similarly, the Eighth Circuit in *Twin City Pipe* found that two letters were ineffective to unequivocally terminate a CBA because, despite explicitly referring to termination, the letters' proposed termination dates differed from the dates specified in the CBA and thus were not "clear and explicit." 759 F.3d at 882, 886; *see also, e.g.*, *Bd. of Trs. of the Teamsters Misc. Sec. Tr. Fund v. Alsco, Inc.*, No. 18-cv-1078, 2019 WL 3852489, at *4 (C.D. Cal. May 15, 2019) (letter expressing "desire . . . to open negotiations for a new agreement" did not terminate CBA).

**B.    The 2013 CBAs were never terminated by either Defendants or Local 89, resulting in an extension of the pension obligations through January 31, 2020.**

Defendants rely on the November 6 Letters in which Local 89 expressed a desire to schedule a date for negotiations and to continue its relationship with Defendants. Local 89's expression of its intent was that it "desire[d] to meet with [the employers] at an early date for the purpose of negotiating a new contract." (SMF-T, ¶ 24; SMF-Z, ¶ 19.) It also expressed its belief that negotiations would bring a "better spirit of harmony and cooperation" between the parties. Thus, like the letters in *Orrand* and *Alsco*, which did not forestall continuation of the CBA under the evergreen clause, Local 89's expectation was that the relationship was continuing, not ending.

Because this case turns on the effect of the evergreen clause, the Seventh Circuit's analysis in *Office & Professional Employees International Union, Local 95 v. Wood County Telephone Co.*, 408 F.3d 314 (7th Cir. 2005), is also instructive. In *Wood County*, the Seventh Circuit held that a letter seeking to "reopen [the CBA] and to negotiate . . . for a *successor* agreement" was not a notice of termination where the CBA stated it would "automatically continue" unless 'terminated by sixty (60) day written notice." *Id.* at 315-16 (emphasis added). Although not an ERISA § 515 case, *Wood County* stands for the proposition that a mere reference to negotiations for a

replacement agreement will not forestall an evergreen clause like the one at issue here.

Furthermore, while the 2013 CBAs do not require that the magic word "terminate" appear in the notice, there must nonetheless be unequivocal evidence of an "intention to terminate." It is, therefore, relevant that the November 6 Letters contained no explicit reference to the 2013 CBAs being terminated, canceled, or otherwise, or anything at all about the 2013 CBAs' status after January 31, 2019. Instead, Local 89 stated only that it wanted to "meet." At most, the letters refer to when the 2013 CBAs were set to expire, but that is not dispositive because "expiration" and "termination" are different concepts. *See Op. Engr's Local 139 Health Benefit Fund v. Gustafson Constr. Corp.*, 258 F.3d 645, 649 (7th Cir. 2001) ("Although that [1991 CBA] *expired* in 1993, it contained an 'evergreen' clause: if neither party *terminated* the contract, it would be renewed automatically." (emphasis added)); *see also infra* pp. 14-15. In short, these letters are miles away from showing that Local 89 unequivocally communicated an intent to terminate the 2013 CBAs.

It is also relevant to consider that the purpose of an evergreen clause is to allow the parties to keep certain crucial terms in place while they negotiate, such as "no-strike, no-lockout" clauses and arbitration provisions. *Wood Cty.*, 408 F.3d at 315. Otherwise, stalled negotiations could lead to a strike or lockout, or replace arbitration with costly litigation. In fact, the existence of the evergreen clause here, coupled with these key terms, makes clear that the bargaining parties did not intend for a mere discussion about a new CBA to result in termination. (*See* SMF-T, Ex. 3, arts. 16.1, 17.1; SMF-Z, Ex. 3, arts. 17.1, 18.1.) Instead, given what was at stake, a clearer expression of intent was required under the duration provision to terminate their CBA.

Defendants argue that because the 2013 CBAs did not have a separate "modification" provision, then Local 89 must have intended the November 6 Letters to serve as notice of termination under the duration provision. (TS Memo., p. 2.) But Local 89 did not invoke the 2013

CBAs' duration provisions in its letters, an assumption Defendants are reading into the letter. Their argument, moreover, ignores that parties can always seek modifications even if their CBA does not include a modification provision. *See, e.g.*, *Wood Cty.*, 408 F.3d at 315; *see also Cent. States, Se. & Sw. Areas Pension Fund v. Standard Elec. Co.*, 87 F. Supp. 3d 810, 816 (N.D. Ill. 2015) (explaining that a modification clause simply makes this contract law principle "explicit").

Aside from the letters, Defendants also rely on the Form F-7s that Local 89 sent to the FMCS (TS Memo., p. 12), but those forms also do not provide incontestable evidence of Local 89's intent. Those forms refer to "proposed termination *or* modification" of the CBA. (SMF-T, Ex. 7, CS00103; SMF-Z, Ex. 6, p. CS00101 (emphasis added).) By referring to "modification," the form "is not in itself sufficient to effect termination" because it is not clear what intention Local 89 had. *In re Baldanza Bakery, Inc.*, 149 B.R. 370, 372 (Bankr. D.N.J. 1992). Further, Defendants suggest that Local 89's selection of the "Renegotiation" box instead of the "Reopener" box indicates termination, as opposed to modification. (TS Memo., p. 6.) But that fails to appreciate that a "reopener" provision has a very specific meaning in labor law. *See Wood Cty.*, 408 F.3d at 315 ("Some CBAs allow mid-term renegotiation at either side's request; such a provision is called a "reopener."). The Form F-7 itself expresses that a "reopen date" should be entered only if the CBA provides for reopening. (SMF-T, Ex. 7, CS00103; SMF-Z, Ex. 6, p. CS00101.) The 2013 CBAs contain no such "reopener" clause, and so Local 89 had no other option but to select the "Renegotiation" box, regardless of its intent. Thus, Local 89's forms do not indicate anything meaningful, let alone that Local 89 sought termination, as opposed to modification, of the CBAs.

Defendants argue that the Fund's position leads to absurd results because they could owe two different plans for the same period. (TS Memo., p. 2.) But courts have rejected that same argument because employer obligations could be too easily circumvented if employers could rely

on promises of substitute coverage. *See, e.g.*, *Alsco*, 2019 WL 3852489, at \*4; *accord Cent. States, Se. & Sw. Areas Pension Fund v. Transport, Inc.*, 183 F.3d 623, 624-26 (7th Cir. 1999) (contributions owed on employees for whom a new 401(k) plan was provided). Defendants also could have easily avoided double payments by negotiating to have the other plan take effect after February 1, 2020. Or, they could have served their own termination notice more than 60 days prior to January 31, 2019. What they cannot do, however, is ask the Court to rewrite their CBAs to allow for a lenient termination procedure, because unambiguous duration provisions must be "enforced strictly." *Contempo Design, Inc. v. Chi. & Ne. Ill. Dist. Council of Carpenters*, 226 F.3d 535, 546 (7th Cir. 2000) (en banc). A judicial re-write would ignore § 515's mandate to enforce the contracts as written, *Gerber Truck*, 870 F.2d at 1149, 1151, and could "undermine the private bargaining process," *Irwin v. Carpenters Health & Welfare Tr. Fund of Cal.*, 745 F.2d 553, 557 (9th Cir. 1984). Because, by their terms, the 2013 CBAs extended under the evergreen clauses, summary judgment should be entered in the Fund's favor.

## II. The bargaining parties could modify the labor contract vis-à-vis themselves, but they could not eliminate the pension obligations prior to January 31, 2020, because of their prior promises to contribute to the Fund for the "entire term" of the applicable CBA.

Defendants also argue in favor of termination because they agreed to provisions in the 2019 CBAs that expressly eliminated their obligations to the Fund on behalf of Local 89 members as of January 31, 2019. (TS Memo., p. 1.) The problem with this argument is that it fails to account for the requirements under the Fund's Trust Agreement, which was expressly incorporated by reference into the 2013 CBAs and obligated Defendants to contribute for the entire term of the 2013 CBAs, including extensions via an evergreen clause. Article III, Section 7(a) of the Trust Agreement, specifically, provides that a union-employer agreement "shall not be enforceable against the Fund . . . [if it] purports to authorize the elimination . . . of the duty to contribute to the

Fund before the termination of the [CBA] . . . under its duration provision (including any extension through an evergreen clause)." (SMF-T, ¶ 21; SMF-Z, ¶ 16.) The Trust Agreement also controls in the event of any conflict between it and a union-employer agreement. (SMF-T, ¶ 22; SMF-Z, ¶ 17.) In Transervice's case, it is bound by a similar provision in the Participation Agreement. (SMF-T, ¶ 16.) As explained above, the failure of the bargaining parties to serve a termination notice by December 2, 2018, means that the evergreen clause automatically extended the term of the 2013 CBAs through at least January 31, 2020. The Trust Agreement's entire-term provision, therefore, requires contributions through that date. Any provisions in the 2019 CBAs that conflict with that promise "shall not be enforceable against the Fund." (SMF-T, ¶ 21; SMF-Z, ¶ 16.)

Indeed, the court arrived at the same conclusion in the Fund's lawsuit against Standard Electric Company. *Standard Elec*, 87 F. Supp. 3d at 810. There, the employer negotiated a new CBA that purported to eliminate the duty to contribute to the Fund effective March 31, 2011, and relied on this CBA as a defense against the Fund's suit for an additional year of contributions. *Id.* at 813. The court, however, found that "once January 30, 2011 (sixty days before March 31) passed without [the union] or [the employer] sending a 'written notice of desire to cancel or terminate[,]' . . . the [CBA]'s new expiration date automatically became March 31, 2012." *Id.* at 814. The court then concluded that the continuance of the CBA had "consequences" under the Trust Agreement, including that the employer owed contributions through the new expiration date of March 31, 2012. *See id.* ("The phrase 'entire term' means what it says: the [CBA]'s *entire* term, not some portion of the term. . . . [O]nce the [CBA]'s expiration date—that is, the end of its term—became March 31, 2012, § 7(a) [of the Fund's Trust Agreement] locked in [the employer's] contribution obligation through that date."). In this way, § 515 is consistent with "[b]lack letter law" relating to third-party beneficiary rights. *Id.* at 814-15 (citing *Gerber Truck*, 870 F.2d at 1151).

This does not, however, make the 2019 CBAs meaningless, as Defendants suggest, or mean that the evergreen clause "locked [them] and Local 89 into the 2013 CBA *for another year.*" (TS Memo., p. 1.) It is true that when a CBA is renewed under an evergreen clause, "all of the attendant contractual obligations naturally continue." *Orrand*, 794 F.3d at 565. But as the court noted in *Standard Electric*, the bargaining parties can always renegotiate other terms as long as they do not "eradicate [the] third-party beneficiary rights." 87 F. Supp. 3d at 815-16. In fact, from February 2019 through January 2020, all of the terms of the 2019 CBAs were in effect except for the portion of the pension clause that related to the Fund. Then, after those 12 months, the entire 2019 CBAs controlled. The 2019 CBAs were also meaningful in that they expressed an intent to terminate the 2013 CBAs, leading the Fund to conclude that notice had been given to terminate Defendants' pension obligations at the end of the one-year extension, or effective February 1, 2020.

The Trust Agreement's "entire term" provision serves an important purpose. ERISA § 515 "allows [plans] to impose uniform participation requirements." *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1025 (4th Cir. 1997). Such requirements help protect plans from the costs and risks of strategic behavior by employers. *Gerber Truck*, 870 F.2d at 1154. For instance, without the "entire term" provision, employers could manipulate their withdrawal date from the Fund (and attendant withdrawal liability) by waiting to see how bargaining as to all terms plays out before seeking elimination of the pension obligation. By setting uniform rules against such manipulation, the Fund can reduce the cost of administering the Fund across the board for all of its participating employers.

## III. Defendants rely on a set of "rules of labor contract interpretation" that do not exist under applicable Seventh Circuit law and that contradict applicable law.

Under case law interpreting ERISA § 515, the employer must show that the bargaining parties' intention to terminate was clearly and unequivocally expressed such that evidence of

termination is incontestable. In their motions, Defendants attempt to reach a different conclusion by creating their own set of "rules of labor contract interpretation," pieced together mostly from statements in dated NLRB decisions. (*See* TS Memo., p. 7.) This approach is not only inconsistent with governing precedent, but it also distracts from the key point that Local 89 did not express a clear and unequivocal intent to terminate the 2013 CBAs.

Before addressing Defendants' specific "rules," there are two main problems with their argument. First, Defendants seem to ignore that the Fund's claims against Defendants arise under ERISA § 515, and not under a labor law statute. "Defenses to the validity of a labor contract and liability under ERISA's section 515 present distinct issues." *Martin v. Garman Constr. Co.*, 945 F.2d 1000, 1004 (7th Cir. 1991). For the policy reasons underlying § 515, as noted above, defenses are limited in ERISA cases, and specifically, a termination defense requires incontestable evidence of an unequivocal desire to terminate. It is fundamental, moreover, that the "[NLRB] is not an expert in contract interpretation." *Chi. Tribune Co. v. NLRB*, 974 F.2d 933, 937 (7th Cir. 1992). Rather, "arbitrators and courts are still the principal sources of contract interpretation." *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 202 (1991). Simply put, NLRB decisions do not govern. The NLRB also resolves disputes in a very different context in which the overarching goal is to preserve "industrial peace" and "good-faith negotiations." *S. Texas Chapter, Associated Gen. Contractors*, 190 NLRB 383, 386 (1971); *see also, e.g.*, *Oakland Press Co.*, 229 NLRB 476, 479-80 (1977) (allowing for "implied termination" to preserve an "amiable collective-bargaining relationship"). But those considerations are not at play in § 515 cases, like this one, where courts must interpret the writings as written. *Gerber Truck*, 870 F.2d at 1149, 1151.

Second, Defendants' method of relying on labor-contract "rules" has already been considered and rejected by the Seventh Circuit, even in the context of a labor case. In *Wood*

*County*, the employer had convinced the district court that two prior decisions established a broad "rule" that any notices initiating negotiations also terminate the CBA. 408 F.3d at 316. But on appeal, the Seventh Circuit rejected any such rule, instead holding that courts must focus on the contracts at issue to determine "what *these* parties set out to achieve with *their* chosen language." *Id.* Here, then, the Court must focus on what the 2013 CBAs required and what the bargaining parties expressed about their intent, as opposed to applying a broad set of rules governing notices.

As for Defendants' specific labor-contract "rules," the rules contradict applicable law because they either ignore the plain language of the CBA's requirements or misinterpret that plain language. For their first rule, Defendants rely on the general principle that a party need not expressly use any magic words, such as the word "terminate," to terminate the CBA to advocate for a more lenient standard of termination. However, under applicable law, the parties must follow the procedure set forth in their CBA, which, here, requires timely written notice of an "intention to terminate [the] Agreement." (SMF-T, ¶ 12; SMF-Z, ¶ 12.) While this language does not require the word "terminate," it does require an expression of intent regarding the status of the prior agreement that is clear and unequivocal. As noted above, nowhere in its letters does Local 89 state its intent as to the status of the 2013 CBA after January 31, 2019. Rather, Local 89 merely refers to the stated expiration date of the CBAs and expresses a desire to "meet" for negotiations. And although Defendants warn against a requirement of magic words, they emphasize that the letters did not expressly state any desire for CBA "modifications." (TS Memo., p. 5.) From that omission, they assume that Local 89 must have sought termination. But that is simply using magic words (or the lack thereof) to reach a desired result. Instead, the 2013 CBAs are clear that there must be an "intention to terminate [the] Agreement" given in writing; otherwise, the 2013 CBAs will continue.

Defendants' authorities for their first "rule" are also not on point. Most are NLRB decisions

where the primary inquiry was whether the employer or union had committed an unfair labor practice (an NLRA violation) by refusing to bargain on the basis that the evergreen clause extended the CBA, a concern that is not present here. *See, e,g.*, *Champaign Cty. Contractors Ass'n*, 210 NLRB 467, 470 (1974); *see also Checker Motors Corp.*, 339 NLRB 291, 299 (2003). Furthermore, the authorities are distinguishable because the language of the CBAs and notices were different. For instance, in *Champaign County*, the CBA stated that *any* notice expressing a "desire to amend, modify, or terminate" would prevent the evergreen clause from extending the contract for another year. 210 NLRB at 468. Given the more tolerant nature of the duration provision, the NLRB found that a Form F-7 precluded the extension of the prior CBA under its evergreen clause. *Id.* at 470; *see also Checker Motors*, 339 NLRB at 297 (CBA allowed for notices expressing a desire to either "amend or cancel" to forestall automatic extension). This is obviously different from a duration provision that, as here, requires a notice of termination—and only a notice of termination—to forestall the evergreen clause. Similarly, the CBA in *Oil, Chemical & Atomic Workers International Union v. American Maize Products Co.*, stated that a notice expressing a desire "to amend or terminate" had the same effect as a termination notice, except that a notice proposing specific modifications would not lead to termination 492 F.2d 409, 410 (7th Cir. 1974); *see Wood Cty.*, 408 F.3d at 316 (stressing that the agreement in *American Maize* "equate[d] notice of desire to amend with notice of desire to terminate"). Here, unlike in *American Maize*, the 2013 CBAs do not allow for an expression of desire for modification to terminate the CBAs.

The Defendants' second "rule" is that "courts have equated the term 'expire' or 'expiration' with termination . . . and vice versa." (TS Memo., p. 10.) This is flat out wrong. Putting aside that Defendants cite only NLRB decisions and no court decisions, they ignore that "expired" and "terminated" do not have the same meaning under "common labor law usage of these terms."

*Kabbes Trucking*, 2004 WL 2644515, at *20. The Seventh Circuit does not equate the terms: a CBA's *expiration* date refers to the end of the CBA's stated term, which may be "renewed automatically" under an evergreen clause absent termination. *Gustafson Constr. Corp.*, 258 F.3d at 649; *see Wood Cty.*, 408 F.3d at 315 (CBA's original "*expiration* date was July 5, 2003," which would extend if not "*terminated* by sixty (60) day written notice" (emphasis added)).

Finally, Defendants' third "rule"—that a notice seeking a "new contract" must be construed as a termination notice (TS Memo., p. 10)—is far too sweeping to apply in every case because the rule would require the court to ignore other language in the writings. Again, in *Wood County*, a CBA extended under an evergreen clause even though a notice expressed a desire to negotiate a "successor agreement" because the notice did not otherwise express an intention to terminate the CBA. 408 F.3d at 315; *see also, e.g.*, *Orrand*, 794 F.3d at 564-65 (no termination where notice referred to "new agreement"); *Alsco*, 2019 WL 3852489, at *3-4 (same). Moreover, in Defendants' cases for this "rule," there was other evidence of termination. In *Baker v. Fleet Maintenance, Inc.*, 409 F.2d 551 (7th Cir. 1969), the union's notice "used the magic word 'terminate,'" as noted by the court in *Wood County*. 408 F.3d at 316 (citing *Baker*, 409 F.2d at 553). And in *New Jersey Esso Employees' Association*, the union had tried to withdraw its letter (a concession that the CBA would terminate absent this action), and the union's president admitted at a hearing that the letter's purpose was to terminate the CBA. 275 NLRB 216, 218 (1985). And again, the standard to prove termination is higher in cases involving unpaid contributions because employers much show incontestable evidence of termination. If they cannot, as here, then the contributions are owed.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions to dismiss and grant summary judgment as to liability in the Fund's favor against both Transervice and Zenith.

Respectfully submitted,

/s/ Frank Blechschmidt
Frank Blechschmidt (ARDC #6308606)
Central States Funds, Law Department
8647 W. Higgins Road, 8th Floor
Chicago, IL 60631-2803
(847) 777-4088
fblechsc@centralstatesfunds.org

October 8, 2020                            *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Frank Blechschmidt, one of the attorneys for Plaintiffs, certify that on October 8, 2020,

I caused the foregoing *Plaintiffs' Consolidated Memorandum in Response to Defendants' Motion*

*to Dismiss and in Support of Motion for Partial Summary Judgment on the Issue of Liability* to be

filed electronically. This filing was served on all parties indicated on the electronic filing receipt

via the Court's electronic filing system.

Respectfully submitted,

*/s/ Frank T. Blechschmidt*
Frank Blechschmidt (IL #6308606)
Central States Funds, Law Department
8647 W. Higgins Road, 8th Floor
Chicago, IL 60631-2803
(847) 777-4088
fblechsc@centralstatesfunds.org

October 8, 2020